# In the United States Court of Federal Claims

No. 13-193 C
(Filed Under Seal: July 24, 2013)
(Reissued: July 29, 2013)

```
*************************************
QWEST GOVERNMENT SERVICES,        *
INC., d/b/a/ CENTURYLINK QGS,     *
                                  *
          Plaintiff,              *        Preaward Bid Protest; Cross-Motions for
                                  *        Judgment on the Administrative Record;
v.                                *        RCFC 52.1(c); Indefinite Delivery,
                                  *        Indefinite Quantity Contracts
THE UNITED STATES,                *
                                  *
          Defendant,              *
                                  *
and                               *
                                  *
CGI FEDERAL, INC.,                *
                                  *
          Defendant-Intervenor.   *
*************************************
```

Thomas O. Mason, Francis E. Purcell, Jr., and Christopher J. Kimball, Washington, DC, for plaintiff.

Alexander V. Sverdlov, United States Department of Justice, Washington, DC, for defendant

Neil H. O'Donnell, San Francisco, CA, and Jeffery M. Chiow, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiff Qwest Government Services, Inc., d/b/a CenturyLink QGS ("CenturyLink"), protests the United States Department of the Interior's ("DOI") solicitation for indefinite-delivery, indefinite-quantity ("IDIQ") contracts for cloud computing capabilities, Solicitation No. D12PS00316.[1] Before the court are plaintiff's motion for judgment upon the administrative

---

[1] Under the terms of the agreed-upon stay in this preaward protest, DOI has made awards under this request for proposals ("RFP" or "solicitation") but has voluntarily limited the task orders that will be issued under those contracts until this protest is resolved. Defendant-intervenor CGI Federal, Inc. ("CGI") is one of the awardees.

record and for declaratory and injunctive relief; defendant's cross-motion for judgment upon the administrative record; and defendant-intervenor's cross-motion for judgment upon the administrative record. For the reasons discussed below, the court denies plaintiff's motion for judgment on the administrative record and grants defendant's and defendant-intervenor's cross-motions for judgment on the administrative record.

## I. FACTUAL BACKGROUND

### A. The Solicitation

#### 1. Preissuance

DOI sought to improve the efficiency and effectiveness of its information technology ("IT") services by reducing costs and providing greater service, security, and support for its users, including DOI and possible defense and other civilian agencies, which would be accomplished through transitioning the agency's existing computing services to a cloud-based infrastructure. Administrative Record ("AR") Tab 5 at 1138. To make the transition to a cloud-based environment, DOI intended to award multiple IDIQ contracts for cloud computing services within seven categories of work, or technical service lines, on a fixed price per unit of service basis. Id. at 1135, 1138.

Before issuing the solicitation, DOI conducted market research, including releasing a request for information ("RFI") to enable industry to identify possible commercial services that could satisfy the agency's requirements. AR Tab 1 at 1-20. DOI provided an overview of its current computer systems and requested that vendors comment on how those companies proposed to transition DOI's current system to a cloud-based environment. Id. Transforming its IT network to a "cloud" would result in relocating DOI's computing resources, such as hardware and software, to a remote location that would be accessed over a network. AR Tab 17 at 3082-92. Vendors were asked to provide information to DOI regarding their hosting capabilities and experience, in addition to describing the best practices and available services for large-scale infrastructure consolidation efforts. AR Tab 1 at 13-20. Twenty-six industry responses were submitted. AR Tab 4 at 1128. [ . . .] The market research confirmed that there were "a number of competitors in the market that ha[d] the ability to meet all of the requirements of this effort,"[2] and that the technical service lines that DOI intended to request were widely used delivery models in the industry. Id. at 1127, 1129.

#### 2. Solicitation Provisions

On July 18, 2012, DOI issued the solicitation. AR Tab 5 at 1131. In the RFP, DOI acknowledged that cloud services were still a maturing market, AR Tab 6 at 2491, but it concluded that there were sufficient commercial offerings to proceed with a commercial item

---

[2] Based upon its analysis of vendor responses to its RFI, DOI decided to structure the RFP to instruct offerors to propose prices for fixed units of service, and offerors would in turn provide pricing for their commercial services based upon discrete units of time. AR Tab 5 at 1142.

acquisition. AR Tab 4 at 1130. The procurement had a $1 billion ceiling, and awards would be, and were made, for a three-year base period followed by three two-year option periods and a one-year option period. AR Tab 5 at 1136-37. Section C of the RFP, while repeatedly stating that specific requirements were set forth in the task order and sample tasks in Section J, described DOI's objectives and identified seven categories of work. Id. at 1139-40. The seven categories were designated as the seven technical service lines: 1) storage services; 2) secure file transfer services; 3) virtual machine services; 4) database hosting services; 5) web hosting services; 6) development and test environment hosting services; and 7) SAP application hosting services. Id. The technical service lines were intended to be the building blocks for the composite services that would be offered in a DOI-wide IT services catalog. Id. at 1138. However, none of the technical service lines defined actual tasks or established requirements for proposals.

Rather, DOI gave guidance and direction to offerors by way of examples of the type of work that each technical service line would entail in seven task orders and sample tasks in Section J. See AR Tab 6 at 2505. The first three of these (Attachments 6, 7, and 8) were "Day 1 Task Orders," i.e., task orders that DOI intended to award shortly after award of the IDIQ contract. See AR Tab 5 at 1220. These three task orders corresponded to technical service lines 7, 6, and 5, respectively. Id. Other guidance was found in Attachments 9, 10, 11, and 12, which defined "Representative Use Cases," or hypothetical sample tasks that represented types of work that offerors could expect to perform. See id. These sample tasks related to technical service lines 1, 3, 4, and 2, respectively. Id. To be eligible to compete for work corresponding to a particular technical service line after contract award, an offeror was required to submit a response to the corresponding technical service line. Id. at 1903, 1924-35. Indeed, the task orders defined in Section J set forth the only specific projects for which offerors were to submit proposals, i.e., no other section of the RFP contained concrete tasks upon which a vendor was to formulate a cloud-based solution.

Offerors were instructed to use the statements of work for Day 1 task orders and representative use cases in preparing their proposals and providing their fixed prices per unit of service. Id. at 1136. The RFP also contained pricing worksheets for storage and virtual machine hosting services. Id. For database hosting, secure file transfer, web hosting, and applications hosting services, offerors were asked to provide their standard pricing structure and formats and identify their units of service for each operating system supported. Id. Day 1 task orders and representative use cases would be included in the agency's overall evaluation under each factor and evaluated separately to determine the best value selections for contract award. AR Tab 6 at 2238-40.

With respect to the use case for virtual machines, the solicitation stated that offerors should provide fixed prices per unit of service for providing cloud-based virtual machine services in support of data center consolidation transition support and new application implementation requirements for the term of the contract, for a capacity not to exceed a certain number of concurrent virtual machines. id. at 2522-23. For evaluation purposes, the virtual machine use case identified various levels of demand for virtual machines by category and size. It also provided for storage services for the virtual machines, and identified four storage classes

that were based upon throughput and availability.[3]  AR Tab 5 at 1836.  For example, class A was identified as having a throughput of 8 gigabytes per second with 100% availability.  Id.  This use case contained a patently obvious mathematical error advising offerors to assume a 110% distribution based upon total volume stored:

| Class A | 40% |
|---------|-----|
| Class B | 40% |
| Class C | 30% |
| Class D | 0%  |

AR Tab 6 at 2370.  Despite the glaring 110% error, not one potential offeror asked DOI a question about the distribution that clearly exceeded 100%.  The use case did not otherwise identify an amount of storage that offerors should use in their proposals, but it did state that for the purpose of preparing proposals, offerors should assume that only certain operating systems were in scope and that the distribution of demand for operating systems was as follows:

| Windows Server | 70% |
|----------------|-----|
| Unix Server    | 10% |
| Linux Server   | 20% |

Id. at 2369.

The virtual machine hosting services use case also provided, for evaluation purposes, a "ramp-up of demand" for virtual servers that identified a range of demand for each contract period.  For example, this demand summary stated that for the three-year base period, the offerors should assume the following yearly ranges of demand:

| Year | From        | To          |
|------|-------------|-------------|
| 2013 | 100 units   | 500 units   |
| 2014 | 500 units   | 1,000 units |
| 2015 | 1,000 units | 3,000 units |

Id. at 2523.

DOI also specified storage requirements under the representative use case for database hosting services for which the use case requested fixed prices per unit of service.  See id. at 2292, 2371-72.  Similar to the representative use case for virtual machine hosting services, this use case identified the same four storage classes, percentage distribution, and distribution demand for operating systems.  Id. at 2371-72.

---

[3]  Throughput is synonymous with bandwidth consumption.  It indicates the average rate of successful message delivery over a communications network.  Typically, it is measured in bits per second, or alternatively, it can be measured in data packets per second or data packets per time slot.

The database hosting services use case also provided, for evaluation purposes, ranges for each year of the three-year base period:

| Year | From | To |
|------|------|-----|
| 2013 | 25 units | 100 units |
| 2014 | 100 units | 250 units |
| 2015 | 250 units | 750 units |

Id. at 2371. For the virtual machine and database hosting services use cases, offerors were required to submit pricing for the "from and to" quantities for the base period and subsequent option periods. Id. at 2362.

The RFP also required offerors to complete a pricing matrix for storage classes. See AR Tab 5 at 1899. Offerors had to identify, amongst other things, their minimum billing increment, units of service ("volume per period of time"), and volume pricing thresholds in gigabytes per month. Id.

Finally, for the storage services representative use case, the RFP stated that offerors were to provide from 500 terabytes to 4.8 petabytes. Id. at 1832. DOI also specified its current operating environment, which described how many systems the agency had and how those systems were used. See id. at 1146-48; AR Tab 6 at 2203, 2492-93.

### 3. Evaluation Criteria

The solicitation established three basic evaluation categories: technical, business management, and price/cost. AR Tab 6 at 2240. Accordingly, offers were to be submitted in three volumes: Volume I, Business Management; Volume II, Technical; and Volume III, Cost/Price. AR Tab 5 at 1917-25.

DOI's technical evaluation would consist of an "analysis of strengths, weaknesses and risks of each proposal." AR Tab 6 at 2240. The technical evaluation factor was broken down into four subfactors of equal importance: 1) service delivery, management, and technical approach; 2) usability and functionality; 3) information security and regulatory compliance; and 4) organizational experience. Id. at 2240-43. DOI's objective was "to obtain the highest technical quality considered necessary to achieve the project objectives, with a realistic and reasonable cost/price." Id. at 2589.

In the business management evaluation, DOI would consider the offerors' subcontracting plan, a determination of contractor responsibility within the meaning of Federal Acquisition Regulation 9.104-1, and an evaluation of the offerors' past performance. Id. at 2243-44. The solicitation provided details for how each of these areas would be evaluated. Id.

Finally, with respect to the price evaluation, DOI would evaluate price reasonableness and realism, as well as compare the offerors' proposed prices. Id. at 2244. DOI's evaluation of cost/price was separate from its evaluation of nonprice factors and would consider whether the cost/price adequately reflected an understanding of the project. Id. DOI would perform a

– 5 –

price/cost analysis to ensure fair, reasonable, balanced, and realistic prices. Id. As noted above, for purposes of the virtual machine and database hosting representative use cases, offerors were to submit their offered pricing at both the "from" and "to" quantities for the base year and each option period. Id. at 2362. Offerors had to provide their fixed prices per unit of service for each of the seven technical service lines that an offeror identified as "in scope" on its "Scope of Offer Matrix contained in Section J." Id. at 2200.

"All evaluation factors other than price, when combined, [were] significantly more important than price. However, between proposals that [were] evaluated as technically equal in quality, cost/price [would] become a major consideration in selecting the successful offeror." Id. at 2589. No award would be made based on superior technical capability if the agency considered the proposed cost/price to be "unreasonable," or if additional cost or price was "not justified by the advantages of an award based on technical superiority." Id.

## B. Prior Proceedings

### 1. Agency Protest

After issuing the RFP, DOI held a preproposal conference that was attended by individuals representing approximately fifty-five different companies. Gov't Cross-Mot. 7. DOI also received and responded to 478 questions that were submitted during the question-and-answer period. See AR Tab 9. As a result, DOI issued amendments to the solicitation to clarify certain issues. AR Tab 6 at 2362; AR Tab 7 at 2351-52. CenturyLink submitted thirty-eight questions and comments to which DOI responded. Gov't Cross-Mot. 7. Of the thirty-eight questions submitted to DOI, not one concerned DOI's patent mathematical error that directed offerors to allocate storage among various categories not to exceed 110%. These questions and answers were posted along with the questions and answers generated during the entire question-and-answer period, which lasted from July 18, 2012, through August 10, 2012. Id. On October 12, 2012, after the initial deadline for the question-and-answer period, CenturyLink resubmitted its questions and comments and requested that DOI change the RFP's pricing and evaluation criteria. Id.; AR Tab 11 at 2939-50. On November 7, 2012, the contracting officer stated that the "period for acceptance of questions closed on August 10, 2012," and, therefore, CenturyLink should "thoroughly review all questions and answers finalized and issued through Amendment No. 5 on October 3, 2012, as well as any subsequent amendments." AR Tab 13 at 2951. On November 16, 2012, CenturyLink submitted a formal agency-level protest, and approximately one month later, DOI dismissed the protest. AR Tabs 14-15.

### 2. United States Government Accountability Office Protest

Ten days after the RFP proposal submission due date, CenturyLink submitted a protest to the United States Government Accountability Office ("GAO"). AR Tab 17 at 2987-3017. CenturyLink's GAO protest raised largely the same challenges as the one it brings in this court. Specifically, CenturyLink alleged that the RFP was unreasonably vague with respect to certain technical requirements for the offerors' proposals, and that the solicitation did not contain clear evaluation criteria. See id. at 3089-90.

During the protest, GAO directed the parties to participate in a telephonic hearing, during which the contracting officer and her assistant answered questions posed by GAO concerning the methodology the agency intended to use in evaluating prices and technical proposals. See id. at 3048. Both DOI and CenturyLink submitted additional comments following the telephonic hearing. See id. at 3048-50. Ultimately, GAO denied CenturyLink's protest on March 7, 2013, in a written decision, finding that the solicitation provided offerors with sufficient details regarding what was expected of them and how their proposals would be evaluated. See id. at 3082-92. GAO explained that DOI was seeking a "commercially available solution" based on a set of requirements, and as such, asking vendors to propose such a solution based on the agency's criteria was appropriate. Id. at 3090. Further, GAO found that because DOI requested that offerors propose "fixed prices per unit of service" for each task order, this approach allowed DOI to meaningfully compare the different proposals it would receive. Id.

## II. PROCEDURAL BACKGROUND

CenturyLink filed its preaward protest in this court on March 14, 2013, seeking a temporary restraining order, a preliminary injunction, and permanent declaratory and injunctive relief. The parties reached an agreement concerning DOI's voluntary stay of certain activities related to the challenged procurement. The parties agreed that the limited stay would remain in effect at least until this court rendered a final decision. Such an agreement obviated the need for the court to resolve plaintiff's motion for a temporary restraining order and motion for a preliminary injunction. The parties then filed and briefed cross-motions for judgment on the administrative record, and oral argument was held on July 11, 2013.

At oral argument, plaintiff asserted that it possessed additional evidence in support of its claim that it wished to present to the court. Specifically, plaintiff claimed that a principal or employee of CenturyLink submitted questions to the agency or raised discussions with DOI officials concerning the 110% mathematical error contained in the solicitation. Plaintiff stated it would submit that evidence by no later than July 18, 2013. The court granted plaintiff's request and permitted defendant and defendant-intervenor one day to review the information that would be submitted and then advise the court whether they would respond to plaintiff's new evidence, and, if so, by what means and by what date. On July 18, 2013, plaintiff filed its submission, which advised that "while CenturyLink personnel recall raising the data allocation issue with DOI officials before filing the agency-level protest, CenturyLink has not been able to identify documentary evidence of those communications." July 18, 2013 CenturyLink Statement 2 (Dkt. No. 59). The same day, defendant and defendant-intervenor filed a status report in which they stated that they did not intend to file supplemental briefing because plaintiff had not identified any evidence that it submitted questions to the agency concerning the 110% storage allocation instruction.

## III. LEGAL STANDARDS

### A. Bid Protests

The United States Court of Federal Claims ("Court of Federal Claims") has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or

any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1) (2006), and may "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs," id. § 1491(b)(2). Interested parties are those "prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001).

The court determines whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law based solely upon the administrative record. 28 U.S.C. § 1491(b)(1), (4); 5 U.S.C. § 702, 706(2)(A) (2012); see also Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). When reviewing agency action alleged to be arbitrary or capricious or an abuse of discretion, the court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." Sys. Application & Tech., Inc. v. United States, 100 Fed. Cl. 687, 711 (2011) (quoting and citing Impresa, 238 F.3d at 1332-33) (citation and internal quotation marks omitted). An agency's decision lacks a rational basis if the contracting officer "entirely failed to consider an important aspect of the problem, offered an explanation for [his] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). A disappointed bidder bears a heavy burden of showing that an agency's decision lacked a rational basis. Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004). The rational basis standard of review is highly deferential. See PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010). The agency decision is entitled to a presumption of regularity, and the court should not substitute its judgment for that of the agency. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971); Great Lakes Dredge & Dock Co. v. United States, 60 Fed. Cl. 350, 359 (2004).

When a disappointed bidder alleges contravention of law, it must show "a clear and prejudicial violation of applicable statutes or regulations." Impresa, 238 F.3d at 1333 (citation and internal quotation marks omitted). Moreover, the plaintiff must make a nonfrivolous allegation that the agency's actions violate a statute or regulation. 28 U.S.C. § 1491(b)(1); Distributed Solutions, Inc. v. United States, 539 F.3d 1340, 1345 n.1 (Fed. Cir. 2008) ("A non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement is sufficient to establish jurisdiction."). The violation must be "rooted in a specific statute or regulation," and not merely be an allegation that the agency has acted arbitrarily or irrationally. Data Monitor Sys., Inc. v. United States, 74 Fed. Cl. 66, 73 (2006).

### B. Cross-Motions for Judgment Upon the Administrative Record

Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), this court reviews the agency's procurement decisions to determine whether they are supported by the already-existing administrative record. The standards applicable to a motion for judgment upon the administrative record differ from those applied in the context of an RCFC

56 motion for summary judgment. Bannum, Inc. v. United States, 404 F.3d 1346, 1355-56 (Fed. Cir. 2005). Unlike an RCFC 56 motion, "proceeding under RCFC [52.1] merely restricts the evidence to the agency record . . . ." Id. at 1356. "Thus, the central inquiry on a motion for summary judgment—whether the movant has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes summary judgment–has no bearing on a review of the administrative record . . . ." Tech Sys. v. United States, 50 Fed. Cl. 216, 222 (2001); accord Bannum, 404 F.3d at 1356 (holding that RCFC 52.1 requires a different standard of review without the burden-shifting and presumptions required pursuant to RCFC 56). In reviewing cross-motions for judgment on the administrative record, the court must determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." & D Fire Prot. v. United States, 72 Fed. Cl. 126, 131 (2006). In a manner "akin to an expedited trial on the paper record," the court will make findings of fact where necessary. Consulting, Inc. v. United States, 78 Fed. Cl. 380, 387 (2007).

## C. Agencies Have Discretion in Describing Requirements in a Solicitation for an IDIQ Contract

A brief overview of four cases discussing agency discretion in devising and setting forth solicitation requirements for IDIQ contracts is appropriate. For instance, in Linc Government Services, LLC v. United States, the Court of Federal Claims explained that in a solicitation for an IDIQ contract, an agency's needs are indeterminate at the time of contracting, and that "the methods that a procuring agency may lawfully employ to evaluate and compare the prices of competing proposals for an IDIQ contract . . . [are] one of first impression for the court." 96 Fed. Cl. 672, 713 (2010); see also id. at 713-14 (stating that "[a]fter all, uncertainty about the government's eventual needs is precisely what drives a procuring agency's decision to select the IDIQ contract vehicle."). The Linc court went on to uphold the agency's price evaluation, stating that its "method for evaluating proposals was a reasonable exercise of the [agency's] discretion in this matter [and] permitted meaningful consideration of price given the uncertainties surrounding the [agency's] anticipated needs." Id. at 714.

The following year, in Glenn Defense Marine (Asia), PTE v. United States, the Court of Federal Claims denied a preaward protest that alleged the agency had failed to include essential information to permit bidders to intelligently prepare proposals and ensure that the agency had a common basis for evaluating proposals. 97 Fed. Cl. 568, 571 (2011). The Glenn Defense court confirmed that a solicitation must provide offerors sufficient information so that they can prepare their proposals intelligently and compete on an equal basis. Id. at 578. In its ruling, the court explained that "in certain circumstances, it may not be possible for the contracting agency to predict its needs accurately. In such circumstances, . . . the solicitation should be based upon the best available information." Id. (citation and internal quotation marks omitted). Therefore, it is not unreasonable for an agency to "base the solicitation upon the best available information, . . . and rely on the professional expertise and business judgment of the bidders to fill in the missing information for themselves." Id. at 580 (citation and internal quotation marks omitted). Further, the court went on to state that "[w]here estimates for various types of required services are not reasonably available, an agency may establish a reasonable hypothetical, consistent with the RFP requirements, to provide a common basis for comparing the relative costs of the proposals." Id.

More recently, in <u>FirstLine Transportation Security, Inc. v. United States</u>, the Court of Federal Claims denied a preaward protest in which the protester argued, amongst other things, that the solicitation failed to provide sufficient information concerning the required services that would permit offerors to compete intelligently and on relatively equal terms.  107 Fed. Cl. 189, 193-94 (2012).  The court recognized the standard previously stated in <u>Glenn Defense</u>, 97 Fed. Cl. at 578, that "[a]s a general rule, offerors must be given sufficient detail in an RFP to allow them to compete intelligently and on a relatively equal basis."  <u>FirstLine</u>, 107 Fed. Cl. at 208 (citation and internal quotation marks omitted).   The <u>FirstLine</u> court further ruled that while the RFP must "'describe the minimum needs of the procuring activity accurately, . . . there is no legal requirement that a competition be based on specifications drafted in such detail as to eliminate completely any risk for the contractor . . . .'"  <u>Id.</u> (quoting <u>Richen Mgmt., LLC</u>, B-406850, 2012 CPD ¶ 215, at *3 (Comp. Gen. July 31, 2012)).  Finally, the court noted that risk "'is inherent in most types of contracts, particularly fixed-price contracts,'" <u>id.</u> at 210 (quoting <u>Foodservice GmbH</u>, B-405400.1, 2011 CPD ¶ 244, at *7 (Comp. Gen. Oct. 31, 2011)), and it is within an agency's discretion "'to offer for competition a proposed contract that imposes maximum risks on the contractor and minimum burdens on the agency,'" <u>id.</u> (quoting <u>Katmai Info. Techs., LLC</u>, B-406885, 2012 CPD ¶ 277, at *4 (Comp. Gen. Sept. 20, 2012)).

Finally, this year in <u>State of North Carolina Business Enterprises Program v. United States</u>, the Court of Federal Claims held that in issuing a solicitation for which the government could not reasonably estimate its needs, the government was required only to provide offerors with the best available information.  In that case, the solicitation sought food services at Fort Bragg.  110 Fed. Cl. 354, 358, 368-69 (2013).  Because troops have been returning home from the wars in Afghanistan and Iraq, there was uncertainty regarding the increase in the number of troops who would be at Fort Bragg, and as a result, uncertainty regarding how much food would be needed for the troops.  <u>Id.</u>  The protester challenged the manner in which the government chose to deal with the uncertainty of how much food would be needed, and essentially argued that it was improper for the government to ask offerors to assume the risk of a fluctuating headcount.  <u>Id.</u> at 358-59.  The Court of Federal Claims ultimately held that requiring offerors to assume this risk was not so onerous as to be arbitrary and irrational.  <u>Id.</u> at 359.  The court, quoting <u>Glenn Defense</u>, 97 Fed. Cl. at 580, noted that the government must only provide offerors with the "'best available information' in order to enable them to bid 'intelligently.'"  <u>N.C. Bus. Enters.</u>, 110 Fed. Cl. at 359.  And the court agreed with the <u>Glenn Defense</u> court, which stated: "When the agency lacks sufficient information to provide the offerors with realistic estimated quantities, it is not unreasonable for the agency to base the solicitation upon the best available information . . . and rely on the professional expertise and business judgment of the bidders to fill in the missing information for themselves."  <u>Glenn Defense</u>, 97 Fed. Cl. at 580 (citation and internal quotation marks omitted), <u>quoted</u> in <u>N.C. Bus. Enters.</u>, 110 Fed. Cl. at 368.  As the <u>North Carolina Business Enterprises</u> court noted, "[t]here is nothing unusual about a private business having to assume risk," and "[i]f plaintiffs do not wish to bear that risk, they do not have to compete for the contract."  110 Fed. Cl. at 369.  The issue was "not whether the [government] could have selected a pricing methodology that (from plaintiffs' perspective) was better—the issue is whether the pricing methodology the [government] did select is arbitrary, capricious, or otherwise contrary to law."  <u>Id.</u> (emphasis omitted).  The court held that the government's methodology was not arbitrary or capricious.  <u>Id.</u>

# IV. DISCUSSION

In its opening brief, plaintiff contends that the solicitation does not provide adequate information regarding the agency's actual storage requirements for any of the technical service lines. Plaintiff then expands upon its argument by claiming that the nature of the problem can be demonstrated by considering the example of the technical service line for virtual machine hosting services. In its reply brief, however, plaintiff argues that its protest concerns the RFP in its entirety, rather than a single task order. As proof that its protest extends beyond the task order of virtual machine hosting services, plaintiff asserts that the discussion of virtual machine hosting services is only an example of the fatal flaws in the solicitation, and argues that the RFP also omits critical data storage information for the database hosting services technical service line and the storage services technical service line. Thus, plaintiff contends that because all of the technical service lines are necessary elements of DOI's cloud computing requirements, the flaws relevant to these technical service lines affect the entire procurement. For the reasons explained below, the court finds that plaintiff's challenges lack merit.

## A. Plaintiff Alleges That the RFP Lacks Adequate Information Regarding Agency Requirements to Permit Offerors to Compete Intelligently and on an Equal Basis for the Virtual Machines Sample Task Order

In its motion for judgment on the administrative record, plaintiff asserts that the RFP does not tell offerors what they need to know in order to compete intelligently on an equal basis with respect to data storage for the technical service line for virtual machines. For instance, plaintiff argues that the RFP does not state what the agency's actual storage requirements are and directs offerors to allocate proposed storage volumes in an irrational manner. Further, plaintiff asserts that the agency does not identify how many virtual machines the agency requires, and the range provided in the solicitation is "so broad as to be meaningless." CenturyLink Reply 10.

As the agency explained during the GAO proceedings, the virtual machines sample task order requested that offerors propose virtual servers, which are machines that regulate and direct network traffic and provide support to other computer systems, but do not store users' files or data. See AR Tab 6 at 2523; AR Tab 17, GAO Hearing Recording 16:04-51. The storage for the virtual servers is for system, not user, files, which take comparatively little space. AR Tab 17, GAO Hearing Recording 16:04-51. The government states that because these system files are routinely generated, their aggregate size is predictable, and as a result, there are established standards for how much digital space is appropriate for a particular server. See id. at 14:25-57. These standards are set differently by various companies that provide commercial servers, but they generally depend on the performance characteristics of the server, the server's operating system, and the number of computers for which the server would be providing services. See id. at 14:25-57, 18:22-35.

Moreover, DOI provided all the necessary parameters for the virtual servers. For instance, the government described the type of operating systems that the servers would need to run—Windows, Unix, and Linux—and identified the percentage of each system that would be required; the performance characteristics of the computers that the servers would be serving; and the speed of data access that the servers would be required to support. See AR Tab 5 at 1836;

AR Tab 6 at 2370, 2523. Further, the government points out that the different categories of speed were identified as separate "classes," and the solicitation defined how much of each class the servers would have to provide. See AR Tab 5 at 1836; AR Tab 6 at 2370. The sample task order also set the maximum number of virtual machines and identified how many of those would be required each year. See AR Tab 6 at 2522-23. DOI established a "From" and "To" quantity for each year of performance. Id. Therefore, all offerors knew that, for example, for the first year of performance, DOI anticipated between 100 and 500 virtual machines would be required. Id.

As is typical in IDIQ solicitations, DOI did not detail the exact needs to be satisfied under the contract because those needs were unknown. See Linc, 96 Fed. Cl. at 713. Based on the parameters set forth in the solicitation, it was up to the offerors to determine how best to provide those servers. "'When the agency lacks sufficient information to provide the offerors with realistic estimated quantities, it is not unreasonable for the agency to base the solicitation upon the best available information . . . and rely on the professional expertise and business judgment of the bidders to fill in the missing information for themselves.'" N.C. Bus. Enters., 110 Fed. Cl. at 368 (quoting Glenn Defense, 97 Fed. Cl. at 580 (citation and internal quotation marks omitted)).

Plaintiff also complains that the combined storage allocation of 110% among storage classes for virtual machines is "problematic" because the RFP instructs the "offerors to allocate storage across the various storage classes in impossible and irrational ratios." CenturyLink Mot. 10. Notably, DOI received nearly 500 questions and responded to them all, but no potential offeror, including plaintiff, asked a question about the patently erroneous 110% storage allocation. Thus, the first time this obvious mathematical error was raised as an issue was in a bid protest, and not, as one would anticipate, during the questions-and-answers period, which occurs before the proposals are submitted. The government acknowledges that the 110% allocation was an error but argues it is de minimis. Moreover, the government notes that offerors could adjust their storage allocations by removing 10% from one of the three classes, or could scale the 110% of required storage to 100% by multiplying the percentage assigned to each storage class—40% for Class A, 40% for class B, and 30% for class C—by 100/110 to arrive at the actual percentage of each storage class they needed (which would be 36.36% for Class A, 36.36% for Class B, and 27.27% for Class C).

In this regard, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") has made clear that "[d]e minimis errors in the procurement process do not justify relief." Glenn Def. Marine (Asia), PTE v. United States, No. 2012-5125, 2013 WL 3185536, at *5 (Fed. Cir. June 25, 2013); see also Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1048 (Fed. Cir. 1994) (holding that "small errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement"). An error is small if it is "so insignificant when considered against the solicitation as a whole that [it] can safely be ignored and the main purposes of the contemplated contract will not be affected." Andersen Consulting v. United States, 959 F.2d 929, 935 (Fed. Cir. 1992). As the Federal Circuit has stated: "'[O]verturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations.'" Grumman Data Sys., 15 F.3d at 1048 (quoting Andersen Consulting, 959 F.2d at 932). The agency's error regarding the

110% allocation is de minimis, which is illustrated by the fact that not one of the potential offerors asked a question concerning the mathematical error. Indeed, as explained previously, DOI received twenty-six industry responses to its RFI, and thereafter, eleven timely proposals in response to its RFP. AR Tab 16 at 2986; Gov't Cross-Mot. 8 n.4. Consequently, a de minimis mathematical error, to which no potential offeror raised a question, is insufficient grounds to reject a solicitation as arbitrary, capricious, or otherwise not in accordance with the law.

## B. Plaintiff Raises Additional Challenges in Its Reply Brief, Alleging that the RFP Lacks Adequate Information Regarding Agency Requirements to Permit Offerors to Compete Intelligently and on an Equal Basis

In its motion for judgment on the administrative record, CenturyLink broadly alleged defects in the solicitation but only identified alleged defects in the sample task order for virtual machines. In its reply brief, however, CenturyLink expanded its challenge to include the representative use cases for storage services and database hosting services. Defendant and CGI argue that the court should not consider these challenges because they are raised in a reply brief. In response, plaintiff asserts that it previously explained that the discussion of virtual machine services was only an example of the fatal flaws in the solicitation.

Defendant and defendant-intervenor are correct. Plaintiff's failure to raise all of its challenges in its opening brief results in the waiver of those arguments raised in the reply. The case law of this court and the Federal Circuit supports this holding. The Court of Federal Claims has held that arguments presented for the first time in a reply brief should be disregarded by the court. See, e.g., Carahsoft Tech. Corp. v. United States, 86 Fed. Cl. 325, 338 n.11 (2009). Moreover, the Federal Circuit has held that "reply briefs reply to arguments made in the response brief-they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration." Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (emphasis omitted). Further, the Federal Circuit has held that an argument not raised until a reply brief is waived "[a]s a matter of litigation fairness and procedure" because "the non-moving party . . . . ha[d] no right to respond to the reply brief, at least not until oral argument." Id.

Nevertheless, because defendant and CGI responded to the arguments raised in plaintiff's reply brief, both in their reply briefs and at oral argument, the court, for the exclusive purpose of providing an alternative holding, considers plaintiff's challenges, and as explained below, finds them without merit.

### 1. Database Hosting Services

Plaintiff argues that with respect to database hosting services, the RFP does not state: (1) how many database servers the agency desires, (2) what amount of storage should be provided for each, or (3) how offerors should allocate the volume of storage across the four classes of storage identified in the RFP. Plaintiff states that Section J, Attachment 11 requires offerors to provide an unspecified number of database servers for each contract period, and instructs offerors to allocate data storage across storage classes, with each class corresponding to a defined throughput speed. Plaintiff points out that as with Attachment 10 regarding virtual

– 13 –

machine hosting, Attachment 11 imposes the "same impossible requirement to allocate storage across classes in ratios that exceed 100%." CenturyLink Reply 5. Thus, plaintiff contends that as a consequence of these omissions, each offeror is bound to propose a different number of database servers, a different volume of storage for each, and a different allocation of storage across storage classes, and as a result, the offerors will not be evaluated on an equal basis.

As with the virtual machines sample task order, DOI defined the performance characteristics for the machines and left it within the offerors' discretion as to how to meet these needs. With respect to the database hosting services sample task order, the agency described the demands on the database servers, such as the operating systems that would be used. See AR Tab 6 at 2524-25. The database hosting services sample task order also defined the number of machines the offerors were required to propose. For instance, offerors were required to propose between 25 to 100 servers in the first year, 100 and 250 servers in the second year, and so on. See AR Tab 5 at 1839. Finally, plaintiff's assertion that the 110% allocation among three classes of storage speed alone warrants judgment in its favor has no support.[4] As stated above with respect to the virtual machines task order, the 110% allocation is an insignificant error that does not warrant overturning this procurement. Moreover, as explained above, the offerors could adjust their storage allocation.

## 2. Storage Services

With respect to the storage services representative use case, plaintiff asserts that the RFP failed to indicate what amount of storage capacity should be used per year. Plaintiff contends that this contrasts with Attachments 10 and 11, where DOI directed the offerors to use the low and high ends of the stated range per year for proposal purposes. AR Tab 6 at 2362. Plaintiff argues that without specific guidance on what total storage value the government desires on a yearly basis, offerors might game the best value model used for the representative use case.

Here again, DOI provided offerors its best available information by providing a range of its needs and expected offerors to use their best business judgment. DOI specified a range of storage capacity, from 500 terabytes to 4.8 petabytes, AR Tab 5 at 1832, and this included the maximum amount of space that offerors were to provide. DOI also set forth its current operating environment, which described how many systems the agency had and how those systems were used. See id. at 1146, 1148; AR Tab 6 at 2203, 2492. The court does not find it arbitrary and capricious that the agency provided ranges for the anticipated requirements. As stated above, the general rule is that "offerors must be given sufficient detail in an RFP to allow them to compete intelligently and on a relatively equal basis," Glenn Defense, 97 Fed. Cl. at 578 (citation and internal quotation marks omitted), but "[w]hen the agency lacks sufficient information to provide the offerors with realistic estimated quantities, it is not unreasonable for the agency to base the solicitation upon the best available information," id. at 580 (citation and internal quotation marks omitted). And, as a result, the agency can "rely on the professional expertise and business

---

[4] Although the solicitation identifies four classes of storage, A through D, in actuality, there are only three classes because the solicitation instructs offerors not to use Class D. AR Tab 6 at 2370. Specifically, the RFP states that the amount of storage speed to be allocated to Class D is zero. Id.

judgment of the bidders to fill in the missing information for themselves." Id. (citation and internal quotation marks omitted). Here, the information and estimates provided in the RFP were sufficient to allow offerors to submit intelligent offers.

### C. Plaintiff Alleges That the Technical Evaluation Criteria Are Unreasonable

Plaintiff next asserts that "because offerors are free to propose widely disparate technical solutions, the Agency will have no way to conduct a uniform technical evaluation." CenturyLink Reply 17. Plaintiff goes on to discuss the alleged defects mentioned above, arguing that as a result, the government has not established a uniform basis upon which to evaluate offerors' technical proposals. Id. Plaintiff's challenges to the evaluation criteria are derivative of the arguments it has raised on the merits relating to the sample task orders and representative use cases. Because the court finds that plaintiff's arguments regarding the alleged defects lack merit, the challenges to the technical evaluation criteria also lack merit and are denied.

### D. Plaintiff Also Alleges That the Price Evaluation Criteria Are Unreasonable

Finally, plaintiff argues that the price evaluation criteria are flawed because of the "unit of service" measure upon which offerors are required to base their pricing for cloud-based services. In particular, plaintiff asserts that the RFP defined "unit of service" in a way that would allow offerors to adopt any unit of measure they deem appropriate. As a result, plaintiff contends, the government will not have an equal basis upon which to evaluate offeror pricing.

Offerors were required to complete spreadsheets detailing various technical characteristics of the machines they were proposing as part of their responses. See AR Tab 5 at 1883-1902. In particular, offerors were required to specify a unit of service value. See, e.g., id. at 1883. The government explained in the GAO proceedings that this unit of service was a breakdown of the cost of the systems the offeror was proposing by a fixed unit of time, whether by hour, day, week, month, or some other increment. See AR Tab 17 at 3048. The government then stated that this unit of service created a scalable way for the agency to compare the prices of different proposals, by taking each proposal's cost per unit of service, and multiplying or dividing that cost to arrive at a fixed cost per hour, day, week, or month. See id.

Section L stated that offerors "must define the price per Unit of Service (UoS) and minimum billing increment for each technical service line" in accordance with the pricing tables provided in Section J of the solicitation. AR Tab 6 at 2360. Those spreadsheets provided a space for offerors to submit a "Unit of Service" price, and provided a parenthetical explaining what the unit of service should be: "Unit of Service (min, hr, dy, wk, mo, other)." AR Tab 5 at 1883. Every term before the word "other" is a measure of time, and the escalation of those units of time—minutes, hours, and then days—suggests that "other" should likewise be a unit based on time.

The government explained before the GAO that based on the unit of service, DOI would be able to compare one offer that "proposes virtual machine pricing on a weekly basis" with another that proposes "on a monthly basis" by multiplying the weekly value by the appropriate amount. AR Tab 17 at 3048. It further explained that DOI had intended to use the same

multiplication to compare offers that proposed different amounts of virtual servers. Id. at 3049. However, these adjustments were rendered unnecessary by Amendment 3 to the solicitation, which required that offerors propose the same numbers of computer systems. Id.

Moreover, this comparison was contemplated in the RFP. Section M stated that the agency would evaluate the "overall cost to the Government" by analyzing "the Day 1 Task Orders and Representative Use Cases," including by "conduct[ing] a comparison of each of the offeror's fixed price unit of services rate as part of the option period rates." AR Tab 6 at 2364. Therefore, the solicitation states that the agency would use the offerors' proposed unit of service costs to compare proposals. The court finds that plaintiff's challenge to the price evaluation criteria has no merit.

## V. CONCLUSION

Because plaintiff has not succeeded on the merits of its protest, the court need not consider whether the standard for injunctive relief has been met in this case. For the reasons set forth above, it is hereby **ORDERED**:

1. Plaintiff's motion for judgment on the administrative record is **DENIED**.

2. Defendant's and defendant-intervenor's cross-motions for judgment on the administrative record are **GRANTED**.

3. The clerk's office is directed to dismiss the complaint with prejudice and enter judgment in accordance with this decision.

4. Prior to the release of this opinion to the public, the parties shall review it for competition-sensitive, proprietary, confidential, or other protected information. The parties shall confer and file a joint proposed redacted version of this decision within **ten days from the date of this decision**.

5. Each party shall bear its own costs.

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge